UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| KARON PARKER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 1:14-CV-00070 |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff Karon Parker appeals to the district court from a final decision of the Commissioner of Social Security denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1] (Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED for further proceedings in accordance with this Opinion and Order.

### I. PROCEDURAL HISTORY

Parker applied for DIB in March 2011, alleging disability as of August 31, 2008, which was later amended to December 10, 2010.[2] (Tr. 68, 181-82.) The Commissioner denied Parker's application initially and upon reconsideration, and Parker requested an administrative hearing. (Tr. 107-08, 129, 137-41.) On July 24, 2012, a hearing was conducted by Administrative Law Judge ("ALJ") Steven Neary, at which Parker, who was represented by counsel, and a vocational

---

[1] All parties have consented to the Magistrate Judge. (Docket # 12); *see* 28 U.S.C. § 636(c).

[2] Parker had a prior DIB application denied on December 9, 2010. (Tr. 68, 93-102.)

expert testified. (Tr. 66-89.) On September 6, 2012, the ALJ rendered an unfavorable decision to Parker, concluding that she was not disabled because despite the limitations caused by her impairments, she could perform a significant number of jobs in the economy. (Tr. 18-27.) The Appeals Council denied Parker's request for review, at which point the ALJ's decision became the final decision of the Commissioner. (Tr. 5-8.)

Parker filed a complaint with this Court on March 7, 2014, seeking relief from the Commissioner's final decision. (Docket # 1.) In this appeal, Parker argues that the ALJ: (1) failed to properly consider the results of the Functional Capacity Evaluation ("FCE") performed by physical therapist, Chad Parent, upon which her treating specialist, Dr. Lutz, relied; and (2) improperly discounted the credibility of her symptom testimony. (Social Security Opening Br. of Pl. 6-16.)

## II. FACTUAL BACKGROUND[3]

### *A. Background*

On the date of the ALJ's decision, Parker was forty-seven years old (Tr. 39, 191); had obtained a high school education and completed cosmetology school (Tr. 196); and had past work experience as a florist, injection mold operator, machine operator, and hair stylist (Tr. 197). Parker alleges that she became disabled due to, among other things, degenerative disc disease, right knee problems, asthma, bilateral hearing loss, carpal tunnel syndrome, depression, and bilateral shoulder pain. (Tr. 195.)

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 676-page administrative record necessary to the decision.

### B. *Parker's Testimony at the Hearing*

At the hearing, Parker testified that she lives with her husband, who works outside the home. (Tr. 69, 78.) Since a work injury in March 2008, Parker has spent most of her days lying on the couch with her feet up. (Tr. 77, 80.) She is independent with her bathing and dressing, but her husband and neighbors do all of the housework. (Tr. 78.) She rides in a motorized cart if she goes shopping with her husband; she cannot sit long enough to attend church. (Tr. 79.) She does drive a car, but only to the doctor's office. (Tr. 79.)

As to her symptoms, Parker, who is four feet, ten inches tall and weighed 178 pounds, stated that she has constant, chronic back pain that makes it difficult to sit or stand for long periods, together with pain in her right knee. (Tr. 73, 82.) She also experiences shortness of breath due to asthma; ringing in her ears; and hand numbness due to carpal tunnel syndrome, which often causes her to drop items and makes writing and lifting difficult. (Tr. 71-72, 76, 80-82.)

Parker estimated that she could sit or stand for fifteen minutes at a time and walk about fifty feet before she has to lie down (Tr. 75-76, 83); she uses a cane when standing or walking (Tr. 80). She did not think that she could lift a gallon of milk. (Tr. 77.) She takes several medications for her back pain, which help "a little bit," but also cause side effects of headaches, dizziness, nausea, and constipation. (Tr. 73-74.) She uses a nebulizer each night and every four hours as needed for her asthma. (Tr. 81.)

### C. *Summary of the Medical Evidence*

In 2006, Parker underwent an anterior cervical discectomy and fusion at C5 through C7 to treat diffuse disc bulging with cervical cord flattening, neuroforaminal narrowing, and loss of

cerebrospinal fluid. (Tr. 253, 395.) Two years later, she had bilateral hemilaminectomies and foraminotomies performed at L2-S1. (Tr. 253, 587.)

In December 2008, Parker was evaluated by a physical therapist for her bilateral knee and back pain and given a home exercise program. (Tr. 359-69.) She was discharged after she failed to return for scheduled visits. (Tr. 369.)

In 2009, Parker underwent a right knee arthroscopy and medial plica excision. (Tr. 341, 523.) That same year she had ear tubes implanted bilaterally to treat moderate-to-severe hearing loss. (Tr. 415.) In 2010, electromyography studies revealed mild right median neuropathy of Parker's right wrist, indicative of carpal tunnel syndrome. (Tr. 273, 559.) An MRI of her spine that same year indicated a bony overgrowth at C5-C6 effacing the ventral thecal sac resulting in mild anterior cord deformity and increased disc degeneration at the C7-T1 level. (Tr. 268.)

In 2011, Parker had a neuroma removed from her right knee. (Tr. 341, 523.) She also had a tympanoplasty performed on her left ear due to continued swelling and hearing issues. (Tr. 406, 540.) A chest x-ray revealed bilateral mild degenerative changes with small extending spurs in the acromioclavicular joints of the shoulder. (Tr. 552.) An MRI of Parker's temporomandibular joints of her jaw indicated complete right meniscus dislocation and severely restricted jaw opening and condylar excursion on the right. (Tr. 553.) In August 2011, Parker underwent an open meniscectomy of her TMJ and started physical therapy to improve the range of motion of her jaw. (Tr. 590-610, 613.) Repeat electromyography studies in 2012 confirmed mild right median neuropathy of Parker's right wrist, indicative of carpal tunnel syndrome. (Tr. 273, 559.)

From at least June 2009 through April 2012, Parker was under the care of Dr. David

Lutz, a pain management specialist, and received steroid injections, physical therapy, and medication management. (Tr. 253, 285, 290, 302, 309, 313, 331, 333, 342-72, 554-55, 559-60, 564, 566, 570, 587, 590-676.) Parker had difficulty tolerating strong painkillers and experienced only moderate pain relief. (Tr. 253, 285, 290, 302, 313.) Dr. Lutz kept Parker off work from at least September 2009 through March 2010. (Tr. 294, 300, 306, 312.) He discussed the possibility of using spinal cord stimulation and radio frequency ablation to help control Parker's pain. (Tr. 285.) Dr. Lutz diagnosed Parker with cervicalgia, cervicogenic myofascial pain syndrome, cervical degenerative disc disease, mild lumbar stenosis, low back and right lumbar radicular pain, status post bilateral L2-S1 hemilaminectomies and foraminotomies, and history of anterior cervical discectomy and fusion at C5-C7. (Tr. 253.)

In June 2009, Parker underwent a mental status examination by Robert Walsh, Psy.D., for purposes of her disability evaluation. (Tr. 249-51.) Parker reported a history of depression, but she had no symptoms at the time and was not receiving any mental health treatment. (Tr. 249, 251.) Dr. Walsh noted that Parker was animated and pleasant; her thought processes were logical; and her attention, concentration, insight, and judgment were good. (Tr. 250.) He diagnosed her with major depressive disorder, recurrent, mild, and assigned a Global Assessment of Functioning ("GAF") score of 63.[4] (Tr. 251.)

In February and August 2010, Parker saw Dr. Steven Fisher, an orthopaedist, for her knee complaints. (Tr. 339-40.) She was using a cane. (Tr. 339.) Examination of the knee showed no

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* And, a GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.*

effusion or significant crepitation, and there were no significant degenerative changes revealed on an x-ray. (Tr. 339-40.) He diagnosed her with anserine bursitis and gave her an injection. (Tr. 339-40.)

In December 2010, Parker was evaluated by a physical therapist for her low back, neck, and arm pain; she was given a home exercise program. (Tr. 347-51.) She was discharged after she failed to return for scheduled visits. (Tr. 351.)

In April 2011, Parker underwent a mental status examination by Dan Boen, Ph.D. (Tr. 422-26.) It revealed that she had a depressed mood; some paranoia and anxiety, as well as panic attacks; some suicidal thinking and past attempt; and mild auditory hallucinations. (Tr. 425.) She had a mild deficit in short term memory, but good long term memory and normal concentration, intelligence, judgment, and insight. (Tr. 425.) Dr. Boen diagnosed Parker with major depressive disorder, recurrent, moderate, and assigned a GAF of 55. (Tr. 426.)

That same month, Parker saw Dr. Fisher for a recheck of her right knee one month post excision of a neuroma. (Tr. 520.) He noted that she was significantly improved and was pleased with the result. (Tr. 520.)

In May 2011, Dr. W. Smits wrote that Parker was under his care for asthma. (Tr. 428.) He opined that her asthma condition did not impair her functioning and that she should have the ability to perform activities and projects consistent with her age. (Tr. 428.)

That same month, B. Randal Horton, Psy.D., a state agency psychologist, reviewed Parker's record and completed a mental residual functional capacity ("RFC") analysis. (Tr. 468-70.) Dr. Horton found that Parker was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to

6

perform at a consistent pace without an unreasonable number and length of rest periods; Parker was not significantly limited in the remaining nineteen mental activity categories. (Tr. 468-70.) Dr. Horton concluded that Parker was capable of completing semiskilled tasks within her physical parameters. (Tr. 470.) Dr. Horton also completed a psychiatric review technique, indicating that Parker had moderate difficulties in maintaining concentration, persistence, or pace, and mild limitations in activities of daily living and maintaining social functioning. (Tr. 472-84.) Dr. Horton's opinion was later affirmed by a second state agency psychologist. (Tr. 514.)

Also in May 2011, Dr. B.T. Onamusi, an internal medicine physician, evaluated Parker. (Tr. 486-88.) He observed that she walked with an antalgic gait, was fairly unsteady, and was reluctant to walk without her cane. (Tr. 486-88.) Grip strength was five pounds in her right hand and fifteen pounds in her left hand; she was able to use her hands for fine coordination and manipulative tasks. (Tr. 488.) She complained of pain upon range of motion of her spine, shoulders, and right knee. (Tr. 488.) He diagnosed her with chronic back and right knee pain, bilateral shoulder pain probably degenerative in nature, and bronchial asthma with intermittent symptoms with exertion. (Tr. 488.) He opined that Parker was capable of performing sedentary work. (Tr. 488.)

On May 31, 2011, Parker underwent a FCE performed by Chad Parent, a physical therapist, upon referral by Dr. Lutz. (Tr. 491-94, 580-86.) The FCE indicated that Parker could lift ten pounds occasionally and negligible amounts frequently, but not lift constantly; and could walk, stand, or sit occasionally, but never squat, kneel, bend, climb, or crawl. (Tr. 493, 584.) He further found that Parker could perform simple grasping and repetitive use of elbow frequently;

7

occasional repetitive use of wrist and assembly work; infrequent light use of arm controls; occasional light use of leg controls; and infrequent reaching. (Tr. 493, 584.) She had decreased sensation to pinprick over her right hand. (Tr. 493, 584.) She initially complained of pain at a level "eight" on a scale of one to ten, which increased to a "nine" by the test's conclusion. (Tr. 491, 580.) Although the FCE results revealed that Parker could sit, stand, or walk on only an "occasional" basis in a workday, Parent wrote in his letter to Dr. Lutz that Parker qualified for "sedentary work indicating occasional lifting of 10 pounds." (Tr. 491, 493, 580, 584.)

The following month, Dr. Fernando Montoya, a state agency physician, reviewed Parker's record and found that she could lift or carry ten pounds frequently and twenty pounds occasionally; stand or walk about six hours in an eight-hour workday; sit for about six hours in a workday; perform unlimited pushing or pulling, other than as limited by lifting or carrying; frequently balance; occasionally climb, stoop, kneel, crouch, or crawl; and avoid concentrated exposure to fumes, odors, dusts, gasses, and poor ventilation. (Tr. 506-13.) Dr. Montoya's opinion was later affirmed by another state agency physician. (Tr. 515.)

In July 2011, Dr. Lutz documented that he had sent Parker for the FCE and that it "found that she could only work at most sedentary duty with a 10 pound lifting restriction," which he thought was "quite significant" and "should make her ability to find gainfully employed work very difficult due to this severe limitation." (Tr. 575.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42

8

U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record, but does not "reweigh the evidence, resolve conflicts, decide questions of credibility," or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process,

9

requiring consideration of the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. *The ALJ's Decision*

On September 6, 2012, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 18-27.) He found at step one that Parker had not engaged in substantial gainful activity since her alleged onset date. (Tr. 20.) At step two, the ALJ concluded that Parker had the following severe impairments: degenerative disc disease, knee problems, obesity, asthma, anxiety/post traumatic stress disorder, and depression. (Tr. 20.) At step three, the ALJ determined that Parker's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 20.)

Before proceeding to step four, the ALJ assigned Parker the following RFC:

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

> [T]he claimant has the residual functional capacity to perform sedentary work . . . (lifting, carrying, pushing, and pulling ten pounds occasionally and less than ten pounds frequently and, in an eight-hour period, sitting for a total of six hours and standing/walking for a total of two hours) except that she is only occasionally able to climb, balance, stoop, kneel, crouch, and crawl. She must avoid concentrated exposure to pulmonary irritants, such as fumes, odors, dusts, and chemicals. In addition, she is limited to simple, repetitive tasks.

(Tr. 21.) Based on this RFC and the vocational expert's testimony, the ALJ concluded at step four that Parker was unable to perform any of her past work. (Tr. 26.) The ALJ then concluded at step five that Parker could perform a significant number of sedentary jobs in the economy, including ticket sorter, information clerk, and addressing clerk. (Tr. 27.) Accordingly, Parker's claim for DIB was denied. (Tr. 27.)

### C. The ALJ Failed to Confront and Resolve a Material Conflict in the FCE Findings Relied Upon by Dr. Lutz

First, Parker argues that a remand is necessary because the ALJ failed to confront and resolve a material conflict in the results of the FCE performed by physical therapist Chad Parent, upon which her treating pain specialist, Dr. Lutz, relied. Parker's argument has merit, as a material conflict exists in the FCE findings, Dr. Lutz then relied upon those flawed findings, and the ALJ in turn relied upon Dr. Lutz's opinion in assigning his RFC (Tr. 23).

Specifically, in addressing the FCE findings and Dr. Lutz's opinion, the ALJ stated:

> In May 2011, the claimant underwent a functional capacity evaluation, which indicated that she was able to perform sedentary work with a ten pound lifting restriction. The claimant's treating neurological specialist, Dr. Lutz, indicated that he agreed with the functional capacity evaluation results. . . .
>
> The undersigned assigns greatest weight to the opinions of Dr. Lutz and Dr. Onamusi . . . .

(Tr. 23.) The ALJ then, relying upon the opinions of Dr. Lutz and Dr. Onamusi, assigned Parker an RFC for sedentary work with occasional postural movements. (Tr. 21.)

11

But as stated above, a material conflict exists in the FCE findings penned by Parent that Dr. Lutz, and then the ALJ, either ignored or overlooked. Specifically, Parent stated in his letter summarizing the FCE results that Parker qualified for "sedentary work indicating occasional lifting of 10 pounds" (Tr. 491); the FCE results, however, actually reflect that Parker could perform only "occasional" sitting (Tr. 493). These findings are in direct conflict with each other.

To explain, the Social Security regulations state that sedentary work generally requires about six hours of sitting in an eight-hour workday. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995); 20 C.F.R. § 404.1567(a); SSR 96-6p, 1996 WL 374185, at *3. In contrast, the regulations define "occasionally" as "occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday." 20 C.F.R. § 404.1567(a); SSR 96-6p, 1996 WL 374185, at *3. Thus, if Parent used the terms "sedentary" and "occasional" as defined by the regulations, his letter to Dr. Lutz summarizing the FCE results conveys that Parker can sit for six hours in an eight-hour workday, while the actual FCE results indicate that Parker can sit for just two hours in an eight-hour workday.

Yet, the Commissioner argues that it is most reasonable to conclude that Parent was unfamiliar with the definition of "sedentary" used in the regulations, and instead intended its lay definition, meaning "seated" or "desk-bound."[6] (Mem. in Supp. 6.) More particularly, the dictionary definition of "sedentary" is "doing or involving a lot of sitting," and the dictionary definition of "occasional" is "happening or done sometimes but not often." http://www.merriam-webster.com/dictionary/occasional (last visited November 26, 2014). Therefore, even when applying the lay definition of "sedentary" and "occasional," the patent

---

[6] The Commissioner does not cite to a source for this proposed definition.

conflict in the FCE findings remains. In short, Parker cannot be limited to sitting "sometimes but not often," and at the same time to, "doing or involving a lot of sitting." *Id*.

"[W]hen the record contains conflicting medical evidence, the ALJ has an affirmative responsibility to resolve that conflict." *Bailey v. Barnhart*, 473 F. Supp. 2d 842, 849 (N.D. Ill. 2006) (citing *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)). "[A]s part of the process of building an analytical bridge from the evidence to a conclusion, the ALJ is always required to confront significant evidence that conflicts with his decision." *Misener v. Astrue*, 926 F. Supp. 2d 1016, 1033 (N.D. Ind. 2013) (citing *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1995); *Diaz*, 55 F.3d at 307-08).

The Commissioner suggests, however, that the FCE results (indicating that Parker could perform only "occasional" sitting) do not qualify as "significant evidence" requiring confrontation by the ALJ. *Id.* The Commissioner states that Parent is not an acceptable medical source under 20 C.F.R. § 404.1513(a); rather, as a physical therapist, he is considered an "other source." 20 C.F.R. § 404.1513(d). But "[a]n AlJ cannot entirely dismiss the medical opinion of an 'other source' simply because he or she is not a doctor; the ALJ is still required to evaluate such an opinion." *Garcia v. Astrue*, No. 1:11-cv-165, 2012 WL 3137890, at *12 (N.D. Ind. Aug. 1, 2012) (citations omitted).

And here, Dr. Lutz adopted Parent's FCE findings, and the ALJ, in turn, assigned great weight to Dr. Lutz's opinion. (Tr. 23.) As such, the conflict in the FCE findings, although originally penned by an "other source," ultimately taints a significant medical opinion of record. Indeed, Parker's ability to sit is a material issue in her DIB application, as the vocational expert testified that there would be no jobs for an individual with the sitting, standing, and walking

13

limitations to which Parker testified. (Tr. 86 ("She had stated that her ability to sit is limited to 10 or 15 minutes; . . . her ability to stand is limited to 10 or 15 minutes, her ability to walk is about 50 feet and there would be no jobs that would allow an individual to alternate positions every 10 or 15 minutes."); *see also* Tr. 88 (stating that an individual who had to change from sit to stand every ten to fifteen minutes and had to balance herself with either hand when standing would not be able to maintain competitive employment).)

Consequently, the Commissioner's final decision will be remanded so that the ALJ can confront and resolve the conflict between the FCE results and the medical source opinions of record with respect to Parker's RFC. *See Indoranto*, 374 F.3d at 474.

*D. The ALJ's Credibility Determination Will Also Be Remanded*

Parker also argues that the ALJ improperly discounted the credibility of her symptom testimony. Because the ALJ's reasoning with respect to Parker's credibility is difficult to trace, at least in part, the ALJ's credibility determination will also be remanded.

In general, an ALJ's credibility determination is entitled to special deference because the ALJ is in the best position to evaluate the credibility of a witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435; *see Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").

Here, the ALJ concluded that Parker's allegations of disabling symptoms were "not entirely credible." (Tr. 23.) In making this finding, the ALJ cited three factors: the medical opinion evidence, Parker's activities of daily living, and the objective medical evidence. (Tr. 23-24.) The ALJ's reasoning concerning these three factors, however, is flawed in certain respects.

1. Medical Opinion Evidence

As to the medical opinion evidence, the ALJ stated:

The undersigned notes that there are no medical opinions of record that support the claimant's allegations regarding her physical impairments and limitations, especially her alleged disabling levels of pain, significant medication side effects, need to take daily naps, difficulty using her hands, need to use a cane or electric cart to ambulate, inability to hear well, and inability to sit, stand, or walk for more than very short periods of time.

(Tr. 23.) The ALJ's broad assertion, however, overstates the record.

First, the FCE results reflect that Parker should perform only occasional assembly work, infrequent reaching and use of arm controls, and occasional repetitive use of wrist; and in her right hand, she demonstrated decreased sensation to pin prick and just five pounds of grip strength. (Tr. 493, 584.) And as stated earlier, the results also state that Parker could perform only occasional sitting, standing, or walking. (Tr. 493, 584.) Thus, the FCE results contradict the ALJ's broad assertion.

The Commissioner, in response, emphasizes that the FCE results came from Parent, who is an "other source"; and as such, the ALJ's statement referring to "medical opinions" is not inaccurate. That is true, but to reiterate, Dr. Lutz relied upon the FCE results, adopting, in essence, the results as his medical opinion. (*See* Tr. 23 ("The claimant's treating neurological specialist, Dr. Lutz, indicated that he agreed with the functional capacity results.").)

And as to Parker's need to use a cane or electric cart, Dr. Onamusi observed during his

15

consulting evaluation that Parker "walked with an antalgic gait and was fairly unsteady . . . and was reluctant to walk without her cane." (Tr. 488.) As the Seventh Circuit Court of Appeals has articulated, a claimant does not need a physician's prescription in order to use a cane. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("Absurdly, the administrative law judge thought it suspicious that the plaintiff uses a cane, when no physician had prescribed a cane. A cane does not require a prescription; it had been suggested to the plaintiff by the occupational therapist."). Therefore, "the fact that an individual uses a cane not prescribed by a doctor is not probative of [her] need for the cane in the first place." *Eaken v. Astrue*, 432 F. App'x 607, 613 (7th Cir. 2011) (citing *Terry v. Astrue*, 580 F.3d 471, 477-78 (7th Cir. 2009)).

2. Activities of Daily Living

Second, the ALJ cited Parker's "activities" as a reason to discount her complaints of disabling pain. In doing so, the ALJ articulated:

> The record reflects that the claimant is able to care for her personal needs with some assistance, drive to her appointments, occasionally shop, and use a microwave. In addition, she stated that she does not need reminders to take her medications or care for her personal needs, that she is good at following instructions, and that she does not have difficulty getting along with others. She also is able to watch television, feed her dogs, make sandwiches, go out alone, count change, and handle bank accounts.

(Tr. 24.)

Of course, "an ALJ may consider a claimant's daily activities when assessing credibility, but ALJs must explain perceived inconsistencies between a claimant's activities and the medical evidence." *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) (citations omitted); *accord Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009). Unfortunately, here "we are left to ponder what exactly are these inconsistencies because the ALJ provided no further explanation."

16

*Zurawski*, 245 F.3d at 887 (stating that the ALJ should have explained the inconsistencies between the claimant's activities of daily living (which were punctured with rest), his pain complaints, and the medical evidence). "Under Social Security Ruling 96-7p, the ALJ's determination or decision regarding claimant credibility must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id*. (internal quotation marks omitted).

In fact, the daily activities cited by the ALJ appear "fairly restricted . . . and not of a sort that necessarily undermines or contradicts a claim of disabling pain." *Id*. Moreover, although the ALJ comprehensively summarized Parker's testimony about her activities at the beginning of his decision, the ALJ later presented a cherry-picked version of activities when discounting Parker's credibility. (*Compare* Tr. 22, *with* Tr. 24.)

That is, when assessing Parker's credibility, the ALJ omitted any mention that Parker reported taking frequent breaks from her activities to lie down with her feet elevated to relieve her back pain, using an electric cart when shopping, and relying on her husband and neighbors for most of the meals and housework. (*Compare* Tr. 24, *with* Tr. 73-80, 83, 220-28); *see Ramey v. Astrue*, 319 F. App'x 426, 430 (7th Cir. 2009) (unpublished) (opining that the claimant's minimal daily activities, which included two hours of house chores punctuated with rest, cooking simple meals, and grocery shopping three times per month, were not inconsistent with her claims of disabling pain); *Zurawski*, 245 F.3d at 887 (same). "An ALJ cannot rely only on the evidence that supports her opinion." *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013).

17

3. Objective Medical Evidence

Finally, the ALJ discounted Parker's credibility based on the objective medical evidence. In doing so, the ALJ stated, among other things, that "[t]here is no evidence in the record that the claimant had any muscle atrophy, long-lasting loss of muscle strength, or long-lasting reflex abnormalities. Thus, while she may sometimes use a cane or an electric cart, use of such devices does not appear to be medically necessary." (Tr. 25 (emphasis added).)

Here, Parker testified that she experiences debilitating chronic back pain, and that her back pain limits her ability to sit, stand, and walk for extended lengths of time. (Tr. 73, 76.) Apparently, the ALJ inferred that Parker's pain claims were not entirely credible due to, in part, that she did not exhibit muscle atrophy, extended muscle loss, or extended reflex abnormalities.

But it is unclear how the ALJ arrived at the premise that a person experiencing debilitating back pain should have signs of muscle atrophy, muscle loss, or reflex abnormalities. *See, e.g.*, *Rodriguez v. Barnhart*, No. 00 C 2005, 2002 WL 31155056, at *6 (N.D. Ill. Sept. 27, 2002) (reversing the ALJ's conclusion that a claimant's testimony of severe back and leg pain was contradicted by normal deep tendon reflexes and intact leg strength where the ALJ did not rely on any medical authority of record for such premise); *Yousif v. Chater*, 901 F. Supp. 1377, 1385 (N.D. Ill. 1995) ("Nowhere in the record is there testimony by a doctor that the pain caused by [the claimant's] condition 'usually' gives rise to the physical manifestations that the ALJ found lacking."). "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996).

Similarly, with respect to Parker's use of a cane, "[a] disability claimant's use of a cane without a prescription appears to be a common observation in discounting the credibility of

18

disability claimants, but there is nothing inherently suspicious about it." *Robinson v. Astrue*, No. 1:11-cv-1591, 2013 WL 1002883, at *5 (S.D. Ind. Mar. 13, 2013). "It can be true that from a strict medical perspective, a person does not need a cane to ambulate appropriately and also true that a claimant honestly and rationally feels too unstable, especially with pain, without a cane." *Id.* (emphasis omitted).

In sum, the ALJ's credibility determination will be remanded so that the ALJ can build an "accurate and logical bridge" from the cited evidence (in particular, the FCE findings, which Dr. Lutz adopted; Parker's daily activities, including her report of frequent rest periods in a reclined position; and her use of a cane) to his conclusion. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order. The Clerk is directed to enter a judgment in favor of Parker and against the Commissioner.

SO ORDERED.

Enter for this 1st day of December 2014.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge